May it please the Court, Robert Klein on behalf of Appellant. I'd like to reserve with the Court's permission two minutes for rebuttal, please. Yes, two minutes. I'm ready to proceed. Yes. Nova Star was a floating hotel. As with any hotel, linens are preeminent. The determination of how those linens were supplied was bound on the ship by the charterer's choice to enter a five-year supply contract. That contract required that supplies of linens had to be unloaded and offloaded in 45 minutes when that ship came into port. That meant the linens that were headed to Nova Scotia for those passengers bound to Nova Scotia were on board, as well as a change of linens for the ship when it returned from Nova Scotia to Portland. That was done seven days a week for 21 consecutive weeks in the season, ran for two seasons out of proposed five seasons as expected. The linens were turned roughly on a three-day basis, meaning they were offloaded, they were brought into the processing facility, they were then processed, cleaned, packaged, and put back ready to be put on board. The ship could not run if it didn't have multiple sets of linens. Those multiple sets of linens obviously reflected the two on board, the two ready to be boarded, those that had come out of process, and spares to cover for when processing could not be completed. The record reflects that the turn took from two to five days, so a surplus inventory had to be on hand. All of the inventory for the Nova Star was dedicated in earmarks for the Nova Star. I'll illustrate that with a few illustrations. One, fitted flat sheets. The flat sheets are for twin size. Mr. Gridley, who is the only witness to testify in this case, both as a fact witness and as an expert witness, indicated there is no use in the rental industry, and I'm going to refer to main rental as Pratt-Abbott, which is the name that's been adopted. Pratt-Abbott does not have use for those. There is no other demand for those. In addition, although they had spec standard type parts for the ship. The linens that you want within the lien that aren't on the ship, there's some linens that are not actually on the ship that you want to have included within the lien, right? Correct. If you sold those linens, those actual linens. Have we sold them? We have not sold them. No. If you had sold them, would you be in breach of the contract? We did not feel a liberty to sell those linens. That's not what I asked. Would we be in breach of the contract? The enforcement of the contract would be by the charterer. The charterer is in breach. But would the sale of the linens put you in breach of the contract? I don't know that the sale of the linens would put us in breach of the contract. So if it wouldn't, then how can they be within the lien? Because that meant you had effective control over the funds. I understand you had an obligation to make sure that you fulfilled the service contract. But with respect to the linens itself that aren't on the ship, you could do whatever you wanted with those particular linens, yet you want them included within the lien. That's what I find a little bit hard to see. Under these circumstances, we see those linens, and no different than bunker oil. I'm looking at perhaps it, and if we can't pronounce the name of the case, I'll call it the Signal Oil case from 1944, United States Supreme Court, in which they said the charterer who secured bunker oil, delivered to the charterer, intended for a collusion. You said the word delivered. Yes, I did say the word delivered. In this situation, you had been delivered. We believe they all had been delivered, since every linen item had been rotated on and off that ship multiple times. But at this time, they weren't delivered. We think that's a construct which is not supportable as the lien law is intended. And in that regard, we're suggesting that the lien is intended to procure what was needed to make that ship operational. Who had physical possession of the oil in bunker oil? I believe the charterer received the possession. I don't want to extend myself on that. I'm not sure. I know there was a designation contract. There was two ships under charter, and it was allocated to those ships. And I've read the case. I don't remember exactly who had control over it, if it was being delivered. I assume it was probably being delivered by the bunker directly to, and the charterer did not take possession. By contrast, I know there's the Hudson River case, Hudson Dane Line case, in which they delivered oil in bunker in bulk to two different barges. In that situation, they said there was no designation of a vessel upon which an allocation could be made, and therefore no lien would attach. Is there any case in which the item that somebody wants within the lien is item that the person who possesses it has legal control to do with as they wish? As you just said, you have legal right to do what you want with these linens. That's why you're not in breach of the contract if you do something with them, if you burn them, if you sell them. Give them away. Right. As long as you fulfill the contract, the other contracting party doesn't care what is done with the linens that aren't on the ship. Our point is that this is a front-loaded contract in which the costs and expenses were incurred within the first two years with a five-year payback. When the charter went upside down and defaulted, recognizing, of course, that the ship owner was a 10% participant in this joint venture, then at that point in time, we have stocked with linens that were dedicated and earmarked for that vessel. Can't you sell them? No. The testimony was they have no salvage value. They have no use in the marketplace. They're essentially rags. They're not enough bulk to constitute a rag sale. And I think Mr. Greenlee's testimony was that he tends to donate these to Goodwill, which is essentially a public service agency, as a charitable donation if he gets to that stage. To the extent that there's a lost value to you, you can still sue under the contract, right? The charter is gone. There's no value there. Yes, we've abandoned those claims, but you're correct. In personam claims would lie against the charter. Why would you do that? You can get a judgment and then get a lien on the vessel. A judgment and then a lien on the vessel. The vessel is now, I think, sailing in Gibraltar. We don't know that it's going to be back. This is intended to protect, I think, these very circumstances. If you got a lien at this time and the vessel is in Gibraltar, would you be able to execute it? I don't know the answer to that. I think it would be challenging. Well, it would be the same procedure you are in now. No, right now we're secured by a bond. The vessel did not. We participated as an interventor in the in-run proceeding when the vessel was arrested by a supplier of bunker and other stores. So we came in as an interventor. There was two claims that remained. Ours is one of those claims. We litigated in front of the judge. Judge Warby teed up this issue very precisely, I think, and referenced the Chimbrow case in doing so, in which he said, the question is whether or not these were deliberate. And he said he did not. Remember, we have two identical issues, which is, I think, is Appendix 27. This is our Exhibit No. 6. It was the second page of that. There was an invoice. The invoice was for materials, exact same materials. Twin sheets were on board. The price that was being charged for that was $8.18 per unit. There were 137 of those. The judge awarded, as part of his $16,000 reward for what was on the vessel, these very items. How do you distinguish this case from Chimbrow? How do I distinguish the case from Chimbrow? Chimbrow, that was Dean that worked as a sub for Hub, fabricating steel for Chimbrow. Chimbrow had a contract with the vessel owner. They were refitting ships to make them supply ships from a previous, I think, function as ammonia nitrate or something haulers. So there was no direct contract or no direct relationship from Dean, way down here, through Hub, through Chimbrow, to the ship. Was the issue the same, the fact that the steel hadn't been delivered? The issue is not. No, I don't think that case turned on the fact that the steel hadn't been delivered or incorporated, I think. It was their decision, I realize. But I think in that case, the decision turned much more on there was no direct relationship between, in that case, it was Dean Steel and the ship owner. So you're saying if there is no direct relationship, it has to be physically delivered. But if there is a direct relationship, it doesn't have to be so long as the items are sufficiently foreseeable or some test like that to be contemplated that they would be delivered. Is that the idea? I think what I'm saying, yes, which is there's no difference between what's been delivered and what happens to sail with the ship and that which is ashore to support the exact same need of the ship. But that's only in the context in which the party to whom it would be physically delivered fully understood that. I mean, what would be the limiting principle there? Jimbo suggests that, you know, if it doesn't get there, it's not delivered and therefore it's not within it. But you're saying that somehow this case is different than that. I'm trying to figure out what is the limiting principle so that it's not just, you know, anything that one that eventually will get there is treated as if it's there. That seems pretty broad. I understand the court's concern. I think the unique circumstances of this case give us the distinction on the facts with Jimbo, and I think it is a factual distinction. We have a charter who bound that vessel for the needs of the vessel at that time, which was a floating hotel. The stores on shore were the linen that had to be rotated in and off. We pay the front end cost. We don't agree that there was some sort of windfall here. Only reason to pursue the claim is we didn't get the payback over the last three years, which is where you get paid for your materials. Just one last question. In fact, the linens that were not delivered that you want within the lean, are all of those linens linens that were, in fact, on the ship at one point? Yes. Counsel, I thought the point of the maritime lean was that the ship can sail away with the goods that were supplied, and so you would have no chance to recover, so you get a lean against the vessel. But that wouldn't be the case here. So, I mean, you still have the goods. So am I wrong about what the point of the maritime lean lies? I don't think there's anything wrong with the point of the maritime lean, and I recognize it's not a material-less lean, so it's designed actually to protect the mission of the ship. But the mission of the ship was protected when the charter entered the contract. It said, I'm not going to buy my own linens. I'm going to buy them through this five-year program. You're going to eventually pay that front-end cost, and you are going to be responsible for putting them on and off. Why would you need a lean against the vessel if there's no risk that it's going to sail away with the necessaries, because they're not on the vessel? It's the security and the mass of the vessel and the value of the vessel, which gives everyone, and the judge below found this, that we relied on the credit of the vessel, which is in extending this type of purchase, funding this level of expense. We did that on behalf of a vessel that was a significant and substantial asset. Is your answer to Chief Judge's question that the vessel is substituted by the body and totally existent, so the vessel doesn't have to be literally arrested at the time? I'm not sure I followed the question, but my understanding of the Chief Judge's question was, why do you need a lean in this circumstance since the vessel is able to sail with or without the linens? And I don't think that's the proper analysis. I think the proper analysis is at the time of the need, which is what the lean law is designed to address with the 1971 amendments in particular. It says at the time the need arose, which was you need to have this level of inventory to manage the needs of a floating hotel in terms of its linen. And that's what was supplied. That was relying on the credit of that vessel, that level of ship, that undertaking. But I think the force of the question is the thing that's unusual about a ship compared to any business that might go under is that the ship, without going under, can sail away. So once the ship sails away, you're out of luck in a way that the ordinary contracting party with a business isn't. Correct. But in this case, the fact that we're dealing with a ship is irrelevant to the injury you're suffering. The only injury you're suffering follows from the fact that a business went under. So it's hard to see why you'd have a special lean rule to deal with that circumstance because it doesn't seem related to the qualities of a ship that made it necessary to have a special lean rule. Well, I'm not asking for a special lean rule. I'm just asking for your appreciation of the maritime lean. No, you are because the maritime lean is the special rule, and you're trying to expand or have something come within it. But you're doing so for reasons that seem unrelated to the fact that it's a maritime vessel. The thrust of what I think I'm doing is saying there should be no distinction between those linens Last question. What about your claim implicates any feature of the business that went under being a ship? The aspect of the claim that's implicated in the feature of it being a ship is that this type of need had to be fulfilled in a very unique way. And that unique way is part and parcel of the shipping industry, which is they could have taken off and said the linens are tremendously valuable and we're just going to sail this ship over to Gibraltar right now, break the contract, break the lease, take it back from the charter. So the ability of that ship to transport itself in commerce, across oceans, other jurisdictions, I think the 1971 amendment said we want to protect, I think they're focused on stevedores, but they wanted to protect the suppliers of a ship because of that ability. Thank you. Thank you. May it please the Court. Good morning, Your Honors. My name is Edward McCall. I'm here on behalf of the vessel and her owners who are in Singapore. I'd like to say initially that this is not a one-off contract that was specially negotiated or signed or constructed for the charter of this vessel. This is, on the face of it, it's obviously Pratt Abbott's standard form rental contract, and Mr. Gridley testified we have the same provision for, if you don't finish the term, with a hotel as with the vessel. And the response to your question was, well, the vessel could leave with the sheaths, but not many of them because most of them aren't on the vessel at any one point in time. I guess the idea is that the hotel will be easier to get at for recovery than a ship will be because the ship can be as big as it now is in Singapore or wherever, right? Although the contract here is with the charterer, and very often the hotel operator wouldn't be the hotel. It would be some entity, and a linen provider under Maine law or Massachusetts law or New Hampshire law wouldn't get a lien on the hotel for providing linens. They would just have a claim against the hotel operator. I guess the question seems to me is whether the idea of the lien is about the goods being on the ship and sailing away so I can't get those goods, or is it about dealing with a contracting party that can go away so I can't deal with that contracting party? Because if it's the latter, then there's more force to their argument, which is when the contract contemplates lots of goods being procured for provision, then the risk that I'm dealing with somebody who can sail away means that I'm going to be stuck with those goods. So what's wrong with looking at that? That's where I take it is their argument. So what's wrong with their way of looking at it? Well, on a couple of levels, it's fundamentally flawed. And the first is that fundamentally their claim is that somebody renting, I guess anything, although that's not clear, to a vessel has a lien for both 100% of the retail value of the item and all of the rent. And there's lots of legal problems that flow from that that we haven't discussed in detail. But, for example, when did that lien attach? It might be timed. I'm sure it depended on it being time-barred. Because if the claim has any theoretical value, and no one's ever asserted this before in any case I've seen, I have a lien for 100% of the retail value and all the rent, both. If that lien attached, it was attached at the start of the contract, not at the time there was an obligation to purchase the inventory, which was after the contract terminated. And the case was tried as a breach of contract claim. There's exhibits in the appendix about the admissibility of paroled evidence in contract formation. There's an argument at page 15 of the transcript about the admissibility of contract negotiations with the charterer, not a party hearsay. And the fundamental part of the claim is the contract. So I think the claim was always, when you're breached, the charterer and maybe the ship had an obligation to buy, and we got a lien at that point in time. And that's how it was presented, and that's how Judge Hornby decided it. And he said at that point in time, you delivered a few things, intending them to be permanently delivered. And in my mind, the district court's mind, which I think is correct, we require permanent delivery to get a maritime lien for a purchase price. Let me answer, Mr. McCall, at this point. The rest of them, the ones that remain on shore, were they set aside, would you agree? No, I would not agree. Well, they could be given to anybody. They could be given away. Wait a minute. I thought that the records show that all these were marked for the ship. No, you're wrong. Post-trial, Brad Abbott asked the district court to make findings that the items were segregated and were never used for any other customer, and the district court declined to make those findings. Isn't that the contrary? Correctly, because maybe I'm wrong. Sometimes I am. The record doesn't show that the linens had the names of the ship on? No, sir. These are not monogrammed or otherwise specialty items. And further to that, Your Honor, Brad Abbott argued that all of the items for which it claims lien were specialty items, and then said, for example, when it talked about twin bed sheets, which are relatively unusual in the hotel industry. But that doesn't apply to all of the items. Its items are listed in Exhibit 2, which we replicated at page 13 of our brief, and many of those items are plainly fungible. For example, Brad Abbott introduced its invoices, which initially it held down as the invoices of stuff it bought for this contract, but admitted at trial, well, it's just invoices. If some of the items in the invoice were associated with this contract, then the entire invoice is in, and we added up all those numbers and saying we paid $195 to buy stuff for this ship, but we didn't. They acknowledged that much of that money was not related to the ship. For example, they claim a lien for 500 white aprons, which they just told you today were specialty items that are segregated, set aside, and of no use to us. In the two years in question, 2013 and 2014, Brad Abbott purchased 4,368 identical, as far as we can tell, white aprons, paying $1.50 for each one of them. So the 500 aprons, which they claim a lien, aren't segregated, they're not special, they're not monogrammed, and they are completely fungible, and it's Brad Abbott's standard business to rent those items to other people. They claim a lien for 10,000 napkins. Just so I understand your legal theory, does it matter if they're monogrammed? I thought it didn't matter. I think there's an interesting question that hasn't been answered that Your Honor posed earlier. What's the limiting factor? And it would be a closer case if the charter ordered these items and ordered them monogrammed, and they were monogrammed, and somehow they were truly set aside and couldn't be used for any other purpose, and there would be an interesting question whether that is some kind of delivery within the meaning of the lien statute. Isn't there a Second Circuit case where the merchandise is set aside for the vessel that a maritime lien applies? There are cases where unusual things are delivered specifically for a vessel and don't get on board, where that's been considered a delivery. And that, we submit, didn't happen here. Brad Abbott is in the business of renting most of these items. I understand you corrected me on the facts, but I thought there was a second, and that's what I was going towards. The Second Circuit case, granted it's a 1937 case, but that holds, that setting aside is the equivalent of delivery. I'm not sure that I'm familiar with the decision, Your Honor, but there are some cases out there that have found delivery under unusual circumstances. There aren't any cases out there that have said the owner and renter of goods to a ship has a lien for both 100 percent of the rent and 100 percent of the retail value of the items rented, and that's the claim here. There's just no support for that. I don't understand those two. I'm not tracking those two sentences. The first sentence was that there are cases saying that set-aside goods can count. A few. Okay. So is your argument that this isn't that because these are not set-aside goods full stop? A couple of points, Your Honor. First of all, those aren't First Circuit cases, and I think the First Circuit cases correctly require a more substantive delivery. Does that mean a delivery? It needs to show a delivery for sale, not a delivery for rent. They made deliveries for rent. They get a lien for rent. They didn't make deliveries for sale, and therefore they don't get the retail value of the stuff they own and rented, and that's Judge Warmbier's decision, and it's 100 percent correct. And the suggestion that Judge Warmbier signaled that he thought it was close is mistaken, and footnote, I think it's five. He noted that there are other circuits that have applied a more liberal standard to the delivery requirement, I think in particular the fifth, and he said, I follow Chingro, the First Circuit rule, but I would reach the same conclusion in this case. I guess I'm trying to sound puzzled. So a very simple rule is if they're on the ship, they're delivered, and if they're not on the ship, they're not. Yes. Is that the rule you want us to adopt? Absolutely, Your Honor. Okay, but you're also saying you win even if the rule is they don't have to be on the ship to be delivered. Absolutely, Your Honor. Okay, and if the rule is that they don't have to be on the ship to be delivered, why do you win? Okay, well, for a couple reasons. First, you can't get a lien for 100 percent of the rent and 100 percent of the retail value. No case has ever said that. It wouldn't make any sense. Every renter of items to a charter would have a liquidated damage clause saying if this is breached for any reason, you have to pay us the retail value of the stuff we've already rented to you, even though you rented it for two years and these sheets are two years old, which is respectfully submit preposterous. I just want to just say, suppose the exact same fact that the rental contract gets entered and all the sheets are monogrammed. Yes. Does what you just said mean that you can't get the lien or you can get the lien? You would not get the lien. Even if they were all monogrammed? I agree. You would not get the lien even if they were monogrammed, but I would say it was a closer case. What makes it closer? The fact that they are. Is it still you're seeking 100 percent for rent? It's a rental contract. Everything's the same. It's just that the sheets were clearly made so that they're not fungible. Right. The argument would be that that is some style of a delivery, and the court should expand the notion of delivery there, although there's still the problem of how can you get 100 percent of the rent and 100 percent of the retail value. So it's a wild double recovery, which Fred Abbott would say it was entitled to as he testified to at trial after four and a half years of the contract, when they would have had $1.5 million in rent paid and they would have been wanting to pay the brand new retail value of four and a half year old linens. And that's their claim. It's wrong on many, many levels and would be a massive problem for the marine industry. And it would be boilerplate in every rental contract. And it's boilerplate in Fred Abbott's contract. And it's boilerplate for standard contracts it has with hotels in Portland and golf clubs in Portland and other users of tablecloths, napkins, farm ops, and the like. But many of the facts argued by Fred Abbott, just to finish in response to your point, the district court didn't find. There's a lot of factual assertion concerning these being segregated goods, these being isolated goods, these being bought exclusively for Fred Abbott, these being used only for the charter, these being used only for the charter, that the district court didn't find. And many of those facts the district court was asked to find recognized that they were disputed and declined to make the findings post-trial. Even if they were right on the law, they couldn't be right on the facts. Thank you, Your Honors. Thank you. Let me come back to a question that was posed. What's unique about the contracts in this vessel situation? And I look at that prospectively, which is your concern, which is if we go in Fred Abbott's direction on these circumstances, is that going to open things up and there are going to be a plethora of lien claims under these circumstances? I think we need to look at how this case was tried. There may be legitimate questions that should have been raised at trial and should have been used to impeach Mr. Gridley, who was not only deposed but presented to Mr. McCall on a collaborative basis to interview him and find out. If there are some things in that $178,000 which are fungible, and Mr. Gridley's testimony that were not, three items alone comprise over 50% of it, and that would be the flat twin sheets and the specialty carts. And at that point in time, I think people would be unnoticed or courts would be unnoticed that you need to try that case and you need to try that case carefully with respect to the damages side. That, I think, is the inherent protection. But to go to the fundamental question, Judge Horn reframed it, and he said, and that's why I think these other components, the factual pieces, are kind of red herrings. I've never seen it brief. We spent eight pages doing analysis of evidence that's already been admitted. By the way, the 1937 case, I think you were thinking about in the Second Circuit, is the Hudson Day line, and that was one in which the Second Circuit said no because that was delivered to the barges on the river and was not allocated specific. There was not going to be a lien allowed, if that's the case we're talking about. The transcript did establish each of the elements, and I don't think it makes sense to go through those, but the transcript at 40-42 said these were specialty items purchased for this particular need. The need of the vessel is what controlled the purchase of those specialty items. These items were offered to the shipowner when that ship was ready to sail and said, take them. I think the response was, we don't know how we're going to be using this vessel in the future. We don't want to be burdened with linen inventory that was specialized and focused on that particular trip and voyage. Thank you.